Louisville & Nashville R. Co. *v.* Hammer *et al.*

(*Nashville*, December Term, 1950.)

Opinion filed March 9, 1951.

702

WALKER & HOOKER and DAVID M. KEEBLE, all of Nashville, for appellant.

ARTHUR M. FOWLER, of Loudon, FRANK CLEMENT and VAL SANFORD, of Nashville, for appellees.

G. EDWARD FRIAR, of Nashville, LUCIUS E. BURCH, JR., of Memphis, *amicus curiae.*

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The Louisville and Nashville Railroad Company filed its petition before the Railroad and Public Utilities Commission of the State of Tennessee in which it sought permission to discontinue Passenger Trains No. 1 and 4 between Knoxville and Copperhill, Tennessee. The petition was filed pursuant to the provisions of Chapter 84 of the Public Acts of 1949. The pertinent part of Section 2 of the Act, and which is deemed to be controlling, reads as follows: "Upon application by the carrier, the Commission shall authorize the discontinuance of any passenger train when it shall be made to appear that for a period of twelve months or more, the direct operating costs of such train have exceeded the aggregate gross revenues therefrom by more than thirty per cent."

Upon the filing of the petition due notice of the application was given. Protests were filed by certain Labor Unions, representing employees of the petitioner, as did a number of citizens residing in the counties affected.

It was the contention of the petitioner that the Public Acts of 1949, above referred to, were mandatory since the proof before the Commission showed conclusively that the railroad brought itself within the wording of the provision above quoted and that "all other matters of evidence, such as the availability of other services etc. are wholly immaterial and irrelevant."

There was a hearing before the Commission resulting in a dismissal of the petition, Commissioner Avery dissenting. Thereupon the L. & N. Railroad Co. filed its petition in the chancery court against the Commission, and certain of the protestants, seeking the writ of certiorari, as provided by Code Section 9008-9018 for a review of the order complained of to the end that it be set aside. The writ was granted and the entire record was transferred by the Commission to the chancery court. The Labor Unions moved the court to dismiss the petition because it did not allege that "it was the first application for the writ of certiorari." The motion was overruled and an exception taken. Later the defendants filed a demurrer coupled with an answer. The Commission filed a separate answer.

The protestants questioned the constitutionality of Chapter 84, Acts of 1949, on the grounds (1) the body of the Act is broader than the caption, (2) "the Act violates Art. 1, Sec. 20 of the Constitution in that it seeks to relieve Railroads from the obligation of existing contracts", and (3) that the Act was not retroactive and "that the period of twelve (12) months after the passage of the Act was not covered by the petition." Other de-

fenses were interposed relating to the insufficiency of the proof offered by the petitioner to bring itself within the provisions of the Act.

The Chancellor overruled all of the foregoing objections, sustained the petition for certiorari, reversed the order of the Commission, and granted the relief sought. The protestants prayed and were granted an appeal to this Court because of the alleged unconstitutionality of the Statute, which is the basis of the petition before the Commission.

■■ The assignments of error question the ruling of the Chancellor upon the several grounds of the demurrer to which we have made particular reference. We find no merit in the assignment that the Chancellor erred in allowing petitioner to amend its petition by alleging that it was the first application for the writ of certiorari. *McGhee* v. *Grady*, 80 Tenn. 89. Amendments relate back to the filing of the original pleadings. *Burgie* v. *Parks*, 79 Tenn. 84; *Cooper's Estate* v. *Keathley*, 27 Tenn. App. 7, 177 S. W. (2d) 356.

The Chancellor in his opinion reviewed the respective Journals of the Senate and the House of Representatives in order to determine therefrom the intention of the Legislature; other questions raised by the above assignments of error are also considered in the opinion.

■ We think Chancellor Wade was correct in his ruling upon each and every question. The opinion is as follows:

"One of the questions presented to the Courts for determination is whether or not the above quoted section of the 1949 Act is mandatory or directory in so far as the duties of the Commission are concerned.

"It is a general rule of law that the word 'shall' ordinarily is construed as being mandatory and not directory

when used in constitutions or statutes. *Rounds* v. *State,* 171 Tenn. 511 [106 S. W. (2d) 212].

"The history of this legislation is reflected in the 1949 Journal of the Legislature and shows that Senate Bill 160, the Act in question, was originally introduced in the Senate by Senator Kemmer. It provided (Section 3) that the Commission could authorize the discontinuance of passenger service:

" 'Whenever the evidence shows that such passenger service, together with the entire service rendered by such common carrier has been and is being carried on at a loss, without reasonable probability that such condition will in the future change for the better; . . .' However, before the passage of said bill in the Senate and before the bill was sent to the House, this particular section was amended to read, as follows:

" 'Upon application by the carrier, the Commission may, in its discretion, authorize the discontinuance of any passenger train when it shall be made to appear that for a period of twelve months or more the direct operating costs of such train have exceeded the aggregate gross revenues therefrom by more than thirty percent.'

"Prior to passage of the bill in the Senate, an effort was made to eliminate the phrase 'may, in its discretion', and substitute in lieu thereof the word 'shall'. This effort was defeated the first time said issue was before the Senate.

"The bill went to the House in the form quoted above,

"On motion of Mr. Bomar, in the House, Senate Bill No. 160 was amended by striking out the above words 'may, in its discretion, authorize', and substituting in lieu thereof the words 'shall authorize'.

"The bill passed the House in that form, and the Senate then concurred in that amendment.

"Taking into consideration the applicable law and the facts surrounding the enactment of the statute in question this Court can reach no other conclusion but that said section should be construed as being mandatory and not directory in so far as the Utilities Commission is concerned.

"Another contention made by the defendants herein in an effort to resist the discontinuance of the trains in question is that by reason of certain contractual and charter obligations the petitioner is obligated to operate its passenger trains forever. The Supreme Court of Tennessee in the case of *N. [Nashville,] C. & St. L. Railway* v. *Hannah, et al.*, 160 Tenn. 586 [27 S. W. (2d) 1089, 70 A. L. R. 837], has held to the contrary. In the case of *Meacham* v. *Louisville & Nashville Railroad Company*, 293 Ky. 642, 169 S. W. (2d) 830, the argument of the protestants was effectively answered in the following manner:

" 'The answer to this argument is that while a railroad is a private corporation, yet it is a quasi public agency, and one contracting with it must have contemplated the fact that when public necessity and convenience required the abandonment of a particular part of its line, it would not be bound by a contract to operate that line in perpetuity.'

"The proof in this cause is uncontradicted and shows that the direct operating costs of the two trains in question for a period of twelve months, ending March 31, 1949, exceeded the aggregate revenue therefrom not only by 30% (the percentage set forth in the statute) but by 177%. For the fifteen months ending June 30, 1949, the operating costs exceeded the revenues by 181%. The Act prescribed 'a period of twelve months or more.' A reasonable construction to be placed on the Act insofar as a period of time within which to figure the deficit

and operating expenses is the twelve month period immediately before the application. This particular period must show a 30% deficit but the applicant is not precluded from showing a longer period of time in order to develop that the losses were not seasonable or temporary.

"The Court is of the opinion that the method of accounting used by the petitioner in establishing the direct operating costs and the gross revenues from Intra-State operation was a feasible one and one recognized by other major railroad companies.

"Having reached the conclusion that the Act in question is constitutional and that the petitioner has conclusively proven that it is entitled to the benefits of the portion of the Act herein above quoted, the Court is constrained to hold that the order of the Commission denying the petitioner the right to suspend its passenger trains nos. 1 and 4 was null and void and that said petitioner is entitled to the relief sought.

"Signed

"Wm. J. Wade, Chancellor."

Counsel for the Commission has filed a brief, with the Court's permission, contending that it would be error to hold that Chapter 84, Acts of 1949, was mandatory, and the Chancellor was otherwise in error in overruling the Commission relative to the railroad's method of determining costs etc. There was no appeal from the Chancellor's ruling by the Commission.

We do not understand that errors may be assigned where no appeal was prayed and granted. But since the questions raised involve a matter of public policy we are pleased to make a brief response. We see no escape from the conclusion reached by the Chancellor that the Act in question was intended as a mandate from the Legislature.

■ Conceding as we do that the public policy of the State recognizes the right of the public to reasonable transportation, which the Commission must consider, it cannot be doubted that the regulation of transportation by common carriers of passengers is a matter of legislative direction.

The Act creating the Railroad and Public Utilities Commission confers upon it the broadest powers in the regulation of railroads in Tennessee. Section 5398 of the Code authorized the Commission to discontinue interstate passenger service upon certain conditions, one of which was when such service "has for any reason become unnecessary in the public interest." In *Nashville, C. & St. L. Ry.* v. *Hannah,* 160 Tenn. 586, 27 S. W. (2d) 1089, 1090, 70 A. L. R. 837, referred to in the Chancellor's opinion, it was held that so long as adequate train service was given between stations involved it was not necessary to obtain the approval of the Commission. It is pointed out, however, that an entire discontinuance of passenger service, without any lawful authorization, would subject such carriers "to proceedings by mandamus, or perhaps their charters and franchise rights to forfeiture", citing 1 Elliott on Railroads, paragraphs 59, 60. It was said by the Court: "Upon the arising of a debatable issue between the railway company and the public served by it, the act empowers the commission to determine the issue and thereby relieve the railroad of the danger of successful attack on the ground of abandoment, nonuser, or inadequate discharge of its charter and franchise obligations and possible impairment of its valuable rights."

The assailed statute, now under consideration, expressly repeals the Code Section above referred to and in its place and stead provides that discontinuance of

passenger service is authorized upon condition "made to appear" (to the Commission) that for a given period "the direct operating costs of such train have exceeded the aggregate gross revenues therefrom by more than thirty per cent."

■ As we construe the foregoing condition, the Louisville and Nashville Railroad in the instant case, as well as other carriers similarly situated, are relieved "of the danger of successful attack on the ground of abandonment, non-user, or inadequate discharge of its charter and franchise obligations", provided there is made to appear the financial loss mentioned in the Act. The Commission has no alternative other than to authorize the discontinuance of train service when the carrier brings itself within the provisions of the Act. If the rights of the traveling public are impaired as a result of this regulatory statute the courts are powerless to provide a remedy by mere judicial pronouncement.

■■ It is next insisted that the body of the Act is broader than the caption and thus violates the State Constitution. Quite a number of cases are cited on the brief of appellants in support of this contention. We are of the opinion, however, that they do not warrant the conclusion that the Act is invalid. The caption of the Act recites that it repeals Section 5398 of the Code and requires common carriers by rail to obtain permission of the Railroad and Public Utilities Commission before discontinuing any intrastate railroad passenger service. The body of the Act relates to no other subject. The caption gave full notice of its objects as well as the nature of the proposed legislation and thus met the constitutional requirements. In *Hunter* v. *Conner,* 152 Tenn. 258, 277 S. W. 71, it was said: "In order to meet the requirements of Const. art. 2, Section 17, it is not

necessary for a title of proposed bill to index the details of the act or give a synopsis thereof, but it is sufficient to direct the mind to the object of the proposed legislation; the general purpose being accomplished if the caption states object of legislation, so that legislative intent may be gathered from the words used.'' To the same effect is *Texas Co.* v. *Fort,* 168 Tenn. 679, 80 S. W. (2d) 658, 660, and other cases. There is no basis for the insistence that the caption of the Act is ''meager'' and that the body deals with matters not germane to it.

In *Texas Co.* v. *Fort, supra,* the assailed statute amended various sections of the Code of 1932 relating to taxes levied upon gasoline. The caption or title of the amendatory Act of 1933 reads: ''An Act to amend Sections 1126 . . . of the Code of Tennessee, 1932; said sections of the Code relating to the Gasoline Tax Laws, providing for an improved method of assessing and collecting said gasoline taxes'' etc. Acts 1933, c. 130. Contention was there made that the caption of the Act made no mention of ''storing'' gasoline while the body dealt with this subject. The Court rejected it with the following comment: ''The manner, modes, means, instrumentalities of enforcement, etc., may be embraced in the body of the act, though not recited in the title'', citing a number of cases.

In *Patterson* v. *Town of Tracy City,* 183 Tenn. 160, 191 S. W. (2d) 432, 434, the question now under consideration was again fully considered. MR. JUSTICE CHAMBLISS, following the citation of numerous decisions, including *Texas Co.* v. *Fort, supra,* said: ''The details of the plan were not required to be set forth in the title. . . . The title discloses the result aimed at; the method is for the body of the act. The 'subject' only is

called for in the title, *not the story; the purpose to do a certain thing, not just how it is to be done.''* (Emphasis supplied.)

The caption of the Act here assailed gave notice that the subject of legislation related to the authority of the Commission to supervise the discontinuance of train service, clothing it with power to grant permission in certain circumstances, making it mandatory when economic conditions were shown to exist, and discretionary when the public interest no longer required the service. The Act undoubtedly met all constitutional requirements.

 ██ It is next assigned as error that the Chancellor should have held that the twelve month period as provided in the Act was not covered in the petition. We find nothing in the Act which justifies such an interpretation.

The retroactivity of the statute does not render it unconstitutional. In 50 Am. Jur., Section 476, p. 493, it is said: "However, a statute is not regarded as operating retroactively because of the mere fact that it relates to antecedent events, or draws upon antecedent facts for its operation." We think the fact that the Act in question was intended to be mandatory carried with it the full and clear implication that common carriers were privileged to avail themselves of its provisions immediately upon its passage, and that reliance could be had upon loss of revenue and cost of operation during the twelve month period next preceding the passage of the Act.

Mr. Sutherland in his able work on Statutory Construction makes the statement: "Mere retroactivity does not make a statute unconstitutional. Aside from the suspicion with which all retroactive operation is regarded, there are no limitations on retroactive laws other

than the constitutional limitations which affect all legislation." Section 2201, page 116. See also *Snider* v. *Brown,* Tenn. Ch. App., 48 S. W. 377, 379; *Harris* v. *Williford,* 179 Tenn. 299, 165 S. W. (2d) 582, 584.

The criteria upon which the invalidity of retroactive statutes are declared is when they involve "vested rights." These statutes are looked upon with disfavor by the courts because of the intuitive belief that there is something inherently bad in such legislation and are more likely to be repugnant to constitutional protections of private rights. (Sutherland.) The effect we have given retroactive or retrospective laws is reflected in *Harris* v. *Williford, supra,* as follows: "Such laws, unless they impair the obligation of contracts, or operate to divest or interfere with what are legally defined to be vested rights, are not obnoxious to either the federal or state constitution."

We do not conceive of the public having such a "vested right" to a means of travel that the Legislature, in the exercise of the State's sovereign authority, may not place a limitation upon it, even to the point of authorizing a discontinuance of the service entirely.

In conclusion we agree with the Chancellor's holding that the method of accounting used by the petitioner to determine operating cost and gross revenue was entirely proper in that it was recognized by other major railroad companies.

The assignments of error are overruled, and the Chancellor's decree is affirmed.

All concur.